# The Attorney General *v.* Lakeview Land Company.

*Bill for Injunction.*

1. *Dedication to public; what necessary to constitute.*—To constitute a dedication there must co-exist the *animus dedicandi*, on the part of the grantor, and an acceptance by the public, or by some one authorized in its behalf.

2. *Same.*—The use by the public of lands, under a mere license or toleration by the owner, is revocable at any time, and lapse of time will not ripen such use by the public into a title by prescription.

3. *Same.*—In the absence of an express dedication the use of lands by the public will not mature into a title by prescription, unless such use excludes the private rights of the owner.


APPEAL from Chancery Court of Jefferson.

Heard before the Hon. JOHN C. CARMICHAEL.

This bill was originally filed in the name of Charles G. Brown, "As Attorney-General of the State of Alabama, on behalf of the people," and subsequently amended by

[The Attorney General v. Lakeview Land Company.]

substituting the name of Massey Wilson, the term of office of the other having expired.

The bill charges that the lands described therein were dedicated to the public as a park, by the Elyton Land Company, the acts constituting the alleged dedication being the mapping and platting of the lands as a park by that company, the sale of lots by it with reference to the map, and the throwing open to the public of said lands, as a park, by said company. The answer specifically denies that the lands were ever platted or mapped as a park by the Elyton Land Company; it avers that the lands, which contain 69 acres, were surveyed into lots and block by the Elyton Land Company, prior to 1883, and that, in 1883, the Elyton Company began a system of improvements on said lands, which were not completed until 1887, in which year the Elyton Company sold the lands for value to the Highland Avenue and Belt Railroad Company. The answer further sets up that, in the year 1884, or 1885, the Elyton Company built a car line from the city of Birmingham to these lands. The nature and extent of the improvements, which were placed on the lands by that company, are set out and the answer details the uses to which these improvements were put. It is averred that, during the entire time the Elyton Company owned the lands, it kept a man and his assistants in charge of the lands, that it exclusively maintained the improvements and controlled the lands, and that it paid taxes on them during the entire time it owned them. The answer shows that the improvements made on the lands by the Elyton Company cost upwards of $100,000, and that, up to the time the bill was filed, neither the public, nor any municipality, asserted any claim to the lands or to any easement in them. The answer traces the title of the lands from the Elyton Company into respondent. The prayer of the bill was, that the defendant might be enjoined from obstructing the free use of the property by the public, on the ground that it had been dedicated to the public by its former owner, Elyton Land Company.

On the hearing, the evidence tended to show, that the lands described in the bill were not platted in the original

survey of the Elyton Land Company, nor were their out-
lines originally shown on the map made by it of its sur-
vey.  The map, which showed the original survey of the
Elyton Land Company of that part of its property which
included that described in the bill, was known as the
"Finkbeiner map." This map was in use by the company,
as its sales map, as early as 1883, and continued to be
used for that purpose until some time in 1887. On this
map, no boundaries of the land, as described in the bill,
in either the first or seventh paragraphs were originally
shown at all, the land constituting the subject of this
suit being, on that map, shown as blocks and streets.
In 1884, the company began to grade this land, made a
lake on it and otherwise improved it, and, contempora-
neously with the making of these improvements, the
company constructed a street car line from the center of
Birmingham to these lands, which were in the woods,
outside of the corporate limits of Birmingham, and which
still are outside of such corporate limits.  The lands thus
improved were used by the company in connection with
and as an adjunct to its car line; this car line afterwards
being converted by the company into a dummy-line and
extended so as to form a loop.  Some time after the im-
provements were commenced, the exact time not appear-
ing, the general boundaries of the land and the location
of the lake were indicated on the Finkbeiner map.  The
courses and distances of these boundaries were not shown
by the Finkbeiner map, nor were any words or signs
marked on the map to indicate that these lands were a
park.  On May 5th, 1887, the Elyton Company contracted
to sell these lands to the Highland Avenue and Belt
Railroad Company; under this contract of sale, the Rail-
road Company was put into possession of the property in
controversy, and thereafter, pursuant to this contract, the
property was conveyed by the Elyton Land Company
to the Railroad Company by deed  After this sale
of  May  5th,  1887,  but  not  before,  the  Elyton
Land  Company  did make  and  use,  as  a  sales
map,  a map  on  which  the  words  "Lakeview  Park"
were marked across this piece of land.  This latter
map, on which the words were so marked, was known as
the "Schoel map,' of which am engraved copy was in evi-
dence.  The original Finkbeiner map was in evidence,

the original map being before the Supreme Court for inspection, by order of the chancellor. Prior to 1885, the Elyton Company had spent $1,400 in improving these lands, and, from March 1st, 1885, until the time it sold them, it derived rents and revenues from them. The pavilion on the lands was built in 1886. This pavilion contained a restaurant, a natatorium, a stage and hall for theatrical performances, and was used for theatrical performances, to which an admission was charged, from the time it was built until the filing of this bill. In March 1887, a hotel which cost $18,000, was commenced on these lands and was completed the following summer, put in operation, and used as such for a number of years. This, and all the other improvements placed on the lands, were put there by the Elyton Land Company and by it operated or leased. The books of the Elyton Land Company show the expenditure of $40,305.57 by it in the improvement of these lands, the total expenditure for such purpose aggregating upwards of $100,000. Among other improvements, placed on the lands by the Elyton Land Company during its ownership of them, were, in addition to the pavilion and hotel, a club house, which was rented to a private club; two dwellings, a house for the keeper employed by the company; green houses, conservatories, a ten acre orchard, vineyard, garden, etc., etc. The Elyton Land Company exclusively paid for the making and maintenance of these improvements, no municipality, or association, or the public, paying anything towards either purpose, and no one, other than the Elyton Company and its successors in title, ever, until the filing of this bill, asserted any claim to, or authority over, these lands. Part of the lands were largely frequented by the public; these lands frequented by the public included six to nine acres of the total sixty-nine acres contained in the entire tract described in the bill. The Elyton Company kept a man and his assistants in charge of the property, during the entire time it owned it; by it, negroes were excluded from the lands, and the general public were excluded from the hotel grounds, the pavilion, the garden, orchard, club grounds, and, at times, from the entire body of the land. There was tes-

timony that outdoor entertainments were given, to which admission was charged, and that permission was first obtained by persons who desired to use the lands for picnics; that the lands are on the outskirts of the Elyton Land Company's survey. At the time the improvements were made, and, in a large measure, up to the time the bill was filed, the lands were in an unimportant neighborhood, though, at the time the improvements were made, the Elyton Land Company built some cottages on its adjacent lands which it let as "summer resorts" to the patrons of the restaurant in the pavilion. No lots were sold within a quarter of a mile of these lands by the Elyton Land Company; nor has the Highland Avenue and Belt Railroad Company made any sales of lots near to, or with reference to, these lands; the Elyton Company was shown to have made sales to three persons by the Finkbeiner map, viz.; to Wilda, Adams, and Garrard. No conveyances were ever made to Wilda or Garrard, the lots contracted to them reverting to the Elyton Land Company for unpaid purchase money, though one lot, bargained to Wilda, was conveyed by the Elyton Land Company to Mrs. Burgamy. Wilda testified that the president of the Elyton Land Company, Dr. Caldwell, who was dead when witness was examined, represented to him that these lands were to be a public park and that they were public grounds. There was testimony that a sign was placed over the gate leading into the grounds, marked "Lakeview Park." The witnesses differ as to the date this was done. The entire tract was enclosed by a substantial fence; the Elyton Land Company regularly assessed and paid taxes on the land during its ownership of them; the Highland Avenue and Belt Railroad Company, and its successors in title, did the same thing.

On the submission on pleading and proof, the chancellor decreed that the complainant was not entitled to the relief prayed for, and dismissed the bill, and this appeal is prosecuted from that decree.

E. D. SMITH and W. K. TERRY, for appellant.—The intention to dedicate is not a secret intention, but is manifested by the outward acts of the owner, which induce

a change of position in accordance with a real or apparent intention of the owner.—*P. C. C. & St. L. R. R. Co. v. Noftsger*, 49 N. E. 332; s. c., 60 N. E. 392; s. c., Ind. App. 614. The public must have accepted the dedication, and the evidence shows that the public used the park, thereby accepting it.—*Abbott v. Cottage City*, 10 N. E. 325; *Attorney-General v. Abbott*, 28 N. E. 346; *Gillian v. Frost*, 61 S. W. 345. Spaces left unmarked on a map or plat may show dedication for street, or other purposes, when taken in connection with dedications, or with uses. 9 A. & E. Ency. Law (2nd Ed.), 60; *Rowan's Ex. v. Town of Portland*, 8 B. Monroe, 346. Payment of taxes does not work an estoppel against the public, nor does it rebut a clear intention to dedicate.—*Rhodes v. Brightwood*, 43 N. E. 942; *Burchman v. St. Louis*, 26 S. W. 687; *San Leandro v. Breton*, 13 Pac. 405; Elliott on Roads and Streets, 131.

BENNERS & BENNERS and ALEX. T. LONDON, *contra.*— A dedication of land to some public use, made by the owner of the fee and accepted for such use by, or on behalf of, the public.—*Elyton Land Co. v. S. & N. R. R. Co.*, 95 Ala. at p. 642. The common law dedication may be express, as by deed, or as by making a plat, and by selling and conveying property with reference thereto; or implied from acts of the owner. The adverse user, by the public, for such a length of time as to create the presumption of a dedication, is twenty years.—Washb. Easements, 197; *Hoole v. Attorney General*, 22 Ala. 190; *Steele v. Sullivan*, 70 Ala. 595. The user by the public must be adverse and not permissive.—*Steele v. Sullivan*, 70 Ala. 595; 9 A. & E. Ency. Law, p. 69. To constitute a dedication, there must be an abandonment by the owner to the use of the public, exclusively, and not a mere user by the public, in connection with a user by the owner, in such measure as they desire.—*Irwin v. Dixon*, 50 U. S. 10; Washb. Easements, 183; *Gage v. M. & O. R. R. Co.*, 84 Ala. 224. Possession and acts of ownership by the person claiming title, contemporaneous with acts which would otherwise establish a dedication, may be conclusive to rebut presumption of dedication.—*People v. Beau-*

*lien*, 2 Doug. (Mich.) 256; *Robertson v. Willsville*, Fed. Cases, 11, 930; *Field v. Manchester*, 32 Mich. 279; *Forsythe v. Dunnegan*, 94 Cal. 438; *People v. Reed*, 20 Pac. (Cal.) 708; *White Bear v. Stewart*, 41 N. W. Rep. 1045; *Downer v. St. P. R. R.*, 23 Minn. 271. Where there has been no acceptance for 15 years, and, in the meantime, the owner has made valuable improvements thereon, the city is estopped to claim dedication.—*Cambridge v. Cook*, 97 Iowa 599; *Reuter v. Low*, 34 L. R. A. 733. Payment of taxes on the land is evidence that there is no intention to dedicate.—9 A. & E. Ency. Law, 42, Note 3, 49. That a space is left blank on a plat, with no designation of its purpose, does not show a dedication. *Town of Maniton v. Tract. Co.*, 70 Pac. Rep. 759; *Shuchman v. Homestead*, 111 Pa. St. 48; *New York v. Stuyvesant*, 17 N. Y. 34; *Oswald v. Grenet*, 15 Tex. 118. Proof of dedication cannot be made from inference from acts of platting and mapping, unless conveyances are made with reference thereto.—*Vanatta v. Jones*, 42 N. J. Law, 561. The owner, by re-purchasing all lots sold, can revoke a dedication made by a plat and sales.—*City of Anaheim v. Langenberger*, 66 Pac. Rep. 855. The extent of the dedication is a question of fact.—*W. Ry. v. A. G. S. R. R. Co.*, 96 Ala. 272, 279; 9 A. & E. Ency. Law, 76.

TYSON, J.—This bill was filed to enjoin the respondent from obstructing the free use by the public of a certain described tract of land, designated in the pleadings as Lakeview Park, upon the ground that it has been dedicated to the public by its former owner, the Elyton Land Company.

Dedications are classified into express and implied. It is admitted by appellant that there was no express dedication by the Elyton Land Company. The contention, however, is that an implied one has been established by the evidence.

To constitute a dedication of either class, confessedly, there must be an intention to dedicate, *animus dedicandi*, on the part of the owner of the property, and an acceptance by the public, or by some authorized person or body acting for and in its behalf. The burden of showing a dedication is, of course, upon the party alleging it. Be-

[The Attorney General v. Lakeview Land Company.]

ing a voluntary donation, it will not be presumed, but the clearest intention to do so must be shown. And, if the use by the public is merely permissive, "As existing by the toleration of the owner, and in subordination to, or recognition of, an implied license from him, the right will not mature into a title by prescription, but is revocable at pleasure."—*Steele v. Sullivan*, 70 Ala. 589.

And so, too, the user of the public must be of such character as to exclude the private rights of the owner. He must be shown to have abandoned his property rights in and to the land, otherwise the use of it by the public, not inconsistent with those exercised by him, must be regarded as permissive only and not adverse.—*Irwin v. Dixon*, 9 Howard, 10, 30; *Jones v. Bright*, 140 Ala. 268.

We need only apply these principles to the facts of the case as disclosed by the evidence, which to our minds not only fails to establish, by that measure of proof required, an intention on the part of the Elyton Land Company to dedicate this land to public uses, but, to the contrary, affirmatively negatives any such intention. Such acts, as are shown to have been exercised by a certain class of the public, were entirely compatible with the rights of the company, as owner.

The original map or plat of the lands belonging to the company, showing a space in which this particular piece of land is situated, which was actually converted by it into the park in controversy, has nothing on it, tending in the remotest degree to indicate an intention to dedicate it to the public as a park.—*Oswald v. Grenet*, 15 Tex. 118.

Some stress is laid in argument upon certain representations claimed to have been made by the president of the company, to purchasers of lots from it, that the park belonged to the public. Of the numerous witnesses examined, only one testifies to any representations made by that officer with respect to this park. Assuming that officer, without special authority, had the power to bind his company in the manner claimed, we do not find that he made the statement that the park was public. The testimony of the witness on this point is that the president stated to him that *it was to be a* public park and not that

it was at the time a public park. But, aside from this consideration, even if it be true that the representation was made at the time it was made, the proprietary acts exercised by the company over the property, openly and notoriously, clearly showed that it was not a public park. The proprietary acts exercised by it were manifested by erecting on the land a large hotel, club house in use by a private club, two dwellings, an enclosed pavilion containing a theatre, dance hall, natatorium and restaurant; an orchard, a garden, vineyard and green houses, a lake upon which boats were hired to visitors. From each of these improvements the company derived an income. The company all along paid taxes upon the land and excluded negroes from the grounds. The grounds were also enclosed by a fence, and a person in charge of them. Thus we see the manner of the company's dealing with this land was inconsistent with an intention to dedicate it.

Upon a review of the entire evidence, we think it clear that the purpose of the company in laying out this park, which was suburban, was to induce a portion of the public, white people only, to patronize its car line. Such portion of it as was left open was intended merely as a pleasure ground for those persons who visited it, and this was the only right ever accorded by the company to the public; one not at all inconsistent with its ownership.

Affirmed.

McCLELLAN, C. J., SIMPSON and ANDERSON, J.J., concurring.