21 So.2d 558

**MARSH v. STATE.**

**I Div. 479.**

Court of Appeals of Alabama.

Jan. 9, 1945.

Rehearing Denied Feb. 13, 1945.

D. R. Coley, Jr., of Mobile, Grover C. Powell, of Atlanta, Ga., Hayden C. Covington, of Brooklyn, N. Y., and Roy A. Swayze, of Arlington, Va., for appellant.

Wm. N. McQueen, Acting Atty. Gen., and John O. Harris and W. W. Callahan, Asst. Attys. Gen., for the State.

26

RICE, Judge.

There is a Statute of Alabama reading in pertinent part as follows, to-wit: "Any person who, without legal cause or good excuse, enters * * * on the premises of another, after having been warned, within six months preceding, not to do so; or any person, who, having entered * * * on the premises of another without having been warned within six months not to do so, and fails or refuses, without legal cause or good excuse, to leave immediately on being ordered or requested to do so by the person in possession, his agent or representative, shall, on conviction, be fined not more than one hundred dollars, and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than three months." Code 1940, Title 14, Section 426.

Appellant was convicted of a violation of the terms of the above Statute; the specific charge against her being that she "without legal cause or good excuse and after having been warned within the past six months not to do so, entered upon the premises of the Gulf Shipbuilding Corporation, a Corporation, contrary to law and against the peace and dignity of the State of Alabama."

.She was tried before the Court, sitting without a jury, and assessed a fine of $50.

The material circumstances, as we will endeavor to state them from the record, are that the land upon which appellant entered, and was arrested, originally belonged to the Tennessee Land Company, a corporation. While in the possession of this Company it erected thereon what is described in the testimony as a "business block."

This "business block" consisted of one building, divided by suitable partitions into several stores, or business places. It fronted toward a public highway, but the front was some 40 or 50 or 30 feet distant from the said highway.

In front of the "business block," running all the way across—some 250 feet—and parallel to the public highway, but upon the private property of the Tennessee Land Company, it had constructed a paved roadway. Between this paved roadway and the front of the "business block," there was a paved sidewalk constructed at the same time as, and as a part of, the said "business block." The paved roadway was separated from the public highway by an unpaved portion of the land of the Tennessee Land Company; and the paved sidewalk was separated from the paved roadway by a likewise unpaved strip of land.

All this was done more than twenty years before the beginning of this prosecution; but there is no dispute but that the Tennessee Land Company, and its successors in interest, throughout that time exercised full control over the paved sidewalk mentioned—the paved roadway being not now involved—as a part of its private property. The stores, or business places, in the so-called "business block," were rented separately to various and sundry parties during these years; and, of course, the paved sidewalk served, without objection on the part of the Tennessee Land Company and its successors in title, the customers of these establishments.

But the testimony is without dispute that throughout the time in question, the Tennessee Land Company and its successors paid the taxes upon and maintained control of the sidewalk in question, along with all its other private property—and that people going upon it for any other purpose than as a means of ingress and egress to and from the stores or business places mentioned were required to procure "permits" from it or them.

It should perhaps be here noted that the property in question, including the sidewalk, was transferred by proper conveyances to the Gulf Shipbuilding Corporation prior to the time of the incidents leading to this appeal.

There is really no great dispute as to the facts in the case.

Appellant, admittedly, or without conflict in the testimony, was duly and properly warned, "within six months preceding" her arrest not to go upon the premises of the Gulf Shipbuilding Corporation.

She did so go upon them—that is, the sidewalk, above, which we will later a little more clearly demonstrate was the "premises" of said corporation, in the sense of the Statute quoted at the beginning of this opinion—and was there arrested on December 24, 1943, on the charge for which she was convicted—giving rise to this appeal.

Appellant is represented here by numerous counsel, who have, jointly, filed an exceedingly voluminous brief in her behalf. They would have us consider a wide variety of questions in reaching a decision in the case.

Among many other things, counsel say: "Petitioner (appellant) Grace Marsh is an ordained minister of the gospel, and as such is one of Jehovah's witnesses. The Watchtower Bible and Tract society, under direction of which she carried forward her ministerial activities, issued to her a certificate of ordination and identification, which was introduced in evidence * * *. Therein it is explained that Jehovah's witnesses are true followers of Christ Jesus and are dedicated to the promulgation of His teachings among the people of goodwill toward Almighty God. This is done in the Apostolic manner as shown in the following scriptures cited from the Bible:

" 'And how I * * * have taught you publickly, and from house to house.' Acts 20:20.

" 'Go ye into all the world, and preach the gospel to every creature.' Mark 16:15.

" 'And he (Jesus) went round about the villages, teaching.' Mark 6:6.

" 'And it came to pass afterward, that he went throughout every city and village, preaching and shewing the glad tidings of the Kingdom of God: and the twelve were with him.' Luke 8:1.

"Petitioner (appellant) said that she devoted her entire life to this work. In addition to orally teaching the people concerning the Kingdom of God, she used various printed publications, such as books, booklets and magazines. Such she distributed to 'any person of good-will who desires to read them.' To the end that this may be accomplished in an orderly manner, the City of Mobile and surrounding communities had been divided up by Jehovah's witnesses into territory sections, and each minister given a section to serve.

"Chickasaw, Alabama, a suburb of Mobile, lies in the territory assigned to petitioner (appellant). * * * The place was owned and developed by the Tennessee Land Company."

We have already stated, hereinabove, of what the relevant development—the "business block"—consisted.

We continue with our quotation from appellant's brief, to-wit:

"In 1941 the Tennessee Land Company sold its property, including the business block in question, to the Chickasaw Development Company, which in turn was shortly absorbed into the Gulf Shipbuilding Corporation, the present owner.

"Representatives of both the present and former owners of the business block declared (and nobody disputed them, we interpolate) that there had never been an express dedication of the streets and sidewalks to the public use and that the owners had always paid taxes on the property thus being used."

However, appellant's counsel say: "The deed conveying the property in question to its present owner shows that there was a recognized dedication of the 'streets, alleys and public roads.' (Because) in the warranty section of the deed, the Grantor (Chickasaw Development Co. Inc.) put the following limitation: '* * * provided however that the warranties herein contained do not apply to areas or property located in any of the streets, alleys or public roads * * * and as to said streets, alleys, public roads * * * this instrument shall constitute a *quit-claim deed* only.' " (Italics supplied by us.)

And then counsel say: "Furthermore, the evidence is undisputed that the sidewalks have never been restricted for the general, orderly use of the public, *peddling excepted*." (Italics added by us.)

Appellant's counsel then quote the Tennessee Land Company's Manager who said he "never stopped anybody from using it (the sidewalk, where appellant was arrested, we interpolate) so long as they used it in an orderly and proper manner and were not there for any gainful purpose."

Counsel then say: "For approximately six months prior to December 24th, 1943,

Grace Marsh (this appellant) * * * had been engaged in the distribution of printed Bible literature to the people living in the Chickasaw development. It was her custom particularly to engage in the distribution of the Watchtower and *Consolation* magazines each Saturday afternoon on the sidewalk in front of the business block. This she would do by standing on the outer edge of the sidewalk near the curb displaying the magazines to the people passing up and down, at the same time calling out in moderate tones, 'Watchtower, announcing Jehovah's Kingdom.' She insisted that the magazines were not for sale and that she was not selling them, but she explained that she offered this literature freely to all persons with whom she came in contact, giving such publications to those who desired to read and study same. The persons receiving this literature were given opportunity to contribute a small sum to assist in printing like literature and to further the charitable work in which she was engaged. But if the person was too poor or otherwise unable to contribute anything, and desired to have literature, she said she let such have the magazines without receiving any contribution."

It is then set out in appellant's brief filed here that she was detained on December 11, 1943, by the officer policing Gulf Shipbuilding Corporation's property, for a short time, but released. After which she went to see Mr. Peebles, Gulf Shipbuilding Corporation's Vice-President in charge of the property in question, and told him that she was "engaged in a charitable Christian work as (an) ordained minister * * * and advised him that since her continuance in this God-given activity to them (her) meant everlasting 'life or death' at the hand of Almighty God, they (she) would have to insist on their (her) constitutional right to distribute this printed message of God's Kingdom to the people in the manner aforesaid." Mr. Peebles told them (her) that regardless of their (her) understanding, they (*she*) would first have to obtain a permit to carry on their (her) work and that he was not willing to issue such a permit. Further he specifically warned them (her) not to come on the streets again.

Thereafter, on December 24, 1943, appellant appeared with her magazines on the sidewalk in front of the business block. They (she) was immediately accosted by Mr. Chatham, the Company (Gulf Shipbuilding Corporation) police officer, who again informed her that she could not carry on her activity without a permit. Appellant said she then "reminded him that we were ordained ministers and that was the right granted to us by the Constitution; we were commanded by Almighty God to do this and we couldn't ask man for permits to do this work; we were not peddlers and we were not soliciting for anything, we were simply there carrying on our Christian educational work in an orderly manner."

The officer then placed them (her) under arrest.

We think what we have set forth, and quoted, hereinabove will make clear the basis for the conclusion we have reached.

■ The fact that all of the stores or business places, which were but "apartments," or "divisions" of the "business block"—consisting of one building—mentioned, were rented—but to different people or parties—at the time of the occurrence of the event giving rise to this prosecution, militated in no way against the possession and control—*otherwise* resting in it—of this "sidewalk" where appellant was arrested, being and remaining in Gulf Shipbuilding Corporation, whose authorized representative gave appellant due notice not to trespass thereon. McMillan v. Solomon, 42 Ala. 356, 94 Am.Dec. 654.

■ And we find nothing in the testimony indicating that the owner of the land on which the sidewalk was constructed had ever in any way relinquished its possession and control of the said sidewalk. The fact that the sidewalk was used freely, and without objection, by the public, solely as a means of ingress and egress to and from the stores in said "business block," was in no way a relinquishment by the owner of its title to same. See Tutwiler Coal, Coke & Iron Co. v. Tuvin, 158 Ala. 657, 48 So. 79.

In fact, the testimony is positively to the fact that throughout the years during which the sidewalk had been in existence the owner of the property had required "permits" to be procured from it by all those using it for any other purpose than as a means of ingress and egress to and from the stores in the said "business block."

■ Of course, for there to have been a "dedication" of the sidewalk in question to the use of the public, it must have been used by said public *"without let or hindrance"* for a period of twenty years prior

to the time of the beginning of the prosecution. (Italics ours.) Central of Georgia R. Co. et al. v. Faulkner, 217 Ala. 82, 114 So. 686, 687.

■ It has been said that "a public highway is one *under the control and kept by the public,* and must be either established in a regular proceeding for that purpose, or *generally* used by the public for 20 years, or dedicated by the owner of the soil and accepted by the proper authorities." (Italics supplied by us.) Bellview Cemetery Co. v. McEvers, 174 Ala. 457, 57 So. 375, 376. And see The Attorney General v. Lakeview Land Company, 143 Ala. 291, 39 So. 303.

■ Clearly, the fact that the Chickasaw Development Company, Inc., simply "quit-claimed" the "streets, alleys and public roads" on the property, operated to give the title to the "sidewalk" to the Gulf Shipbuilding Corporation in *exactly* the same way that it was held by the grantor.

No, the Gulf Shipbuilding Corporation had a perfect right to give to appellant, through its duly authorized representative as appears, the notice not to "trespass" upon the sidewalk where she was arrested.

And we come now to her real "defense" —that, as she says, to use her own words: "I reminded him (the officer, and agent of the Gulf Shipbuilding Corporation) we were Ordained Ministers and that was the right granted to us by the Constitution; we were commanded by Almighty God to do this and we couldn't ask man for permits to do this work; we were not peddlers and we were not soliciting for anything, we were simply there carrying on our Christian educational work in an orderly manner."

Or, as her counsel state it: "The Statute (under which she is prosecuted), insofar as it has been construed and applied by the court below to allow the owner of the sidewalk and street arbitrarily to prohibit petitioners (appellant) from distributing thereon in an orderly manner Bible literature explaining God's Kingdom constitutes an unreasonable abridgement of petitioner's (appellant's) rights of freedom of speech, press, assembly and worship, contrary to the first and fourteenth amendments to the United States Constitution, and Article One, Sections 1, 3, 4, 6 and 25 of the Alabama Constitution."

In brief filed here on behalf of the State it is said: "Apparently appellant relies on the constitutional provisions protecting religious freedom as her chief and real defense. This defense seems to be presented on two theories. First, that our Statute is unconstitutional when one is charged with a trespass after warning if the defendant appears to be trespassing while engaged in propagating his religious views. Second, that a party engaged in such religious activities is within his constitutional rights whether he is acting in a public place or on private property. This is more chimerical than any of these numerous Jehovah Witnesses cases we have found." See Sarah Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645.

We are not sure that we understand the language we have just quoted. If the able and distinguished Assistant Attorney General writing the brief meant by "this" in the last sentence of the quotation, a *holding* by any court that either of the "theories" he refers to constituted a *defense* to a charge such as is here involved, we agree with him.

But if he meant that either of the two "theories" were "more chimerical than any of these Jehovah Witnesses Cases we have found," we believe we can help him.

■ We seem to have found a case involving facts not distinguishable—in so far as the applicable law is involved—from those shown by the undisputed testimony in this case. And, mutatis mutandis, we approve of the holding involved in the quotation we shall take from the annotation, appearing at page 655 of 146 A.L.R., following the report of the case of Commonwealth of Massachusetts v. Noah S. Richardson (Com. Mass. v. Fred E. Stanton) 313 Mass. 632, 48 N.E.2d 678, 146 A.L.R. 648, viz.: "In State v. Martin (1941) 199 La. 39, 5 So.2d 377, the court sustained the constitutionality of a Statute penalizing any one who should enter upon private property after having been warned not to do so, as against the contention that it violated the First and Fourteenth Amendments to the Constitution of the United States, particularly the latter, forbidding any State to make or enforce any law which shall abridge the privileges or immunities of citizens of the United States or deprive any person of life, liberty, or property without due process of· law or deny any person within its jurisdiction the equal protection of the laws, and the third and fourth sections of Article 1 of the Constitution of

Louisiana, prohibiting any law 'to curtail or restrain the liberty of speech or of the press,' and providing: 'Every person has the natural right to worship God according to the dictates of his own conscience. No law shall be passed respecting an establishment of religion, nor prohibiting the free exercise thereof; nor shall any preference ever be given to, nor any discrimination made against, any church, sect, or creed of religion, or any form of religious faith or worship,' as applied to the defendant and her codefendants, who were ordained ministers of the gospel of the organization known as Jehovah's Witnesses and whose duties were to visit people in their homes and present to them recorded Bible lectures, Bibles, and Christian pamphlets and literature, and who in the performance of those duties entered upon private property 'sufficiently posted by the owner warning trespassers off,' and after an additional verbal warning by the owner, continued to propound their ideas verbally and through the use of phonograph records. The court said: 'The argument of the relatrix is that, because she and her companions were engaged in such praiseworthy work, preaching Christianity and distributing "Christian pamphlets and other Christian literature," she and her coworkers, while so engaged, were protected by the constitutional inhibition of laws respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press. These guaranties of freedom of religious worship, and freedom of speech and of the press, *do not sanction trespass in the name of freedom. We must remember that personal liberty ends where the rights of others begin. The constitutional inhibition against the making of a law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press, does not conflict with the law which forbids a person to trespass upon the property of another.'* " (Italics supplied by us.) And we refer to the opinion in the case of Commonwealth of Massachusetts v. Richardson (Com. of Mass. v. Stanton), and the entire Annotation following same, cited hereinabove.

The rather lengthy quotation we have set forth—especially the portion we have italicized—expresses our views better, we believe, than we could state them otherwise. It is applicable—with the substitution of our own constitutional provisions—in substance similar—for those of the State of Louisiana. And we rest our decision on what is there said.

Since appellant feels aggrieved because she is made amenable to our Statute against "trespass after warning," when, as she says, she was simply obeying the command of the Master—Jehovah God, if it pleases her—to "go ye into all the world, and preach the gospel to every creature" (Mark 16:15), we would remind her that this same Master *also cautioned* her, that "* * * whosoever shall not receive you, nor hear your words, when ye depart out of that house or city, shake off the dust of your feet" (Mathew 10:14); which we take to be an injunction not to go back on private property, after having been duly warned to stay away.

The judgment is affirmed.

Affirmed.