# CASES

DECIDED IN THE

# COURT OF APPEALS OF GEORGIA

AT THE

## MARCH TERM, 1918.

---

## 9280. JACKSON *v.* THE STATE.

Under the particular facts of this case the defendant was not guilty of violating section 412 of the Penal Code (1910).

DECIDED MARCH 6, 1918.

Accusation of disturbing public worship; from city court of Floyd county—Judge Nunnally. October 15, 1917.

*W. B. Mebane,* for plaintiff in error.

*J. F. Kelly, solicitor,* contra.

BROYLES, P. J. The defendant, J. W. Jackson, was charged with disturbing public worship in Holbrook's chapel, on August 19, 1917, "by cursing and using profane and obscene language, and by interrupting and disturbing J. D. O'Bryan, and preventing the said O'Bryan from conducting prayer meeting at said chapel." A verdict of guilty was returned, and a straight sentence of twelve months on the chain-gang was imposed by the trial judge. The material undisputed facts, as disclosed by the record, are here stated: The defendant was a minister of the "True Baptist," or, as it is more commonly known, "Holy Roller" faith. On invitation from a number of the residents of the community, he had been conducting a series of religious meetings in Holbrook's schoolhouse, which had been built by the community for school and church purposes. He began preaching there on Tuesday night, August 14, 1917, and had preached there on every subsequent night up to Sunday, August 19, 1917. On that Sunday, in the afternoon, he held services in the chapel and notified his congregation that he would also preach there that night, and invited everybody to come and hear him. For about two years the people of the

community had been having prayer-meetings in the schoolhouse, but no such meeting had been held there on Sunday nights for two or three weeks prior to the 19th of August. The prayer-meetings, when held, were led sometimes by J. D. O'Bryan, the superintendent of the Sunday-school, and sometimes by other persons. Some time during the day on Sunday, August 19, Sunday-school was held at the schoolhouse, and Mr. O'Bryan at that time told those assembled that they were invited to a prayer-meeting to be held there that night, and that he would then speak to them on an important matter. O'Bryan then did not know that arrangements had been made by the defendant to preach there that night. On the night in question O'Bryan reached the schoolhouse first, and lit some small lamps therein. Soon afterwards the defendant arrived and lit two large gas-lamps, which he placed on each side of the room, and took a seat on the front bench. When the congregation had assembled O'Bryan called up the choir, and, after some hymns were sung, a prayer was offered. O'Bryan then read a chapter from the Bible, and while he was doing so the defendant asked him what chapter he was reading from. O'Bryan told him, and the defendant opened his Bible. When O'Bryan finished reading the chapter he told those assembled that he was not going to comment on the chapter, but that instead he was going to say something for the good of the community. He then said, in substance, that the community was being divided and demoralized by the religious meetings which were being conducted by the defendant. Thereupon the defendant arose, and saying to O'Bryan, "Tell the truth," asked to be allowed to say a word, opened his Bible, read a verse from it, and said that all there, including O'Bryan, who did not believe in the teachings of the Bible would go to hell. O'Bryan told Jackson to sit down, that he could talk when he (O'Bryan) was through, and Jackson promptly sat down. O'Bryan then continued his abuse of Jackson and his religious followers, saying, among other things, that "Jackson and his crowd had come from the lowest down scrapings of the earth." Jackson then arose again, and once more said to O'Bryan, "Tell the truth." O'Bryan again told Jackson to sit down, and Jackson obeyed. At this juncture there was considerable talking by other persons in the house, and some confusion, and O'Bryan announced that on account of the confusion the congregation would consider itself dismissed without the benediction. When this announcement was made by

O'Bryan, the defendant was seated, and was saying and doing nothing. A good many people started to leave. The defendant then arose and announced that he was going to preach, and re-marked, "When you turn on the light and sunshine the lizards begin to crawl out." He then attempted to preach, but the confu-sion was so great he gave it up, and the people dispersed. Three fourths of those present at the prayer-meeting came on the defend-ant's invitation to hear him preach. Several of them testified that they did not belong to his faith, but that they liked his preaching, as it was straight Bible doctrine, and that they had come there to hear his sermon.

In our opinion, under the facts just stated (which were undis-puted), the conviction of the accused was unauthorized. The evi-dence clearly shows that on the night in question his right to the possession of the meeting-house was as good as, if not better than, that of O'Bryan, and that the great majority of the people there assembled had come, not to attend the prayer-meeting, but to hear the defendant preach. There was not the slightest evidence that the defendant was intoxicated, or that he cursed or used profane or obscene language, or that he otherwise indecently acted. The indictment is based on section 412 of the Penal Code (1910), which is as follows: "Any person who shall, by cursing or using profane or obscene language, or by being intoxicated, or otherwise indecently acting, interrupt, or in any manner disturb, a congregation of per-sons lawfully assembled for divine services, and until they disperse from such place of worship, shall be guilty of a misdemeanor." The rule is universal that all criminal statutes must be strictly construed. We do not think, however, that, even under a liberal construction of this statute, the evidence authorized the conviction. In our opinion it was not the legislative intent, in enacting the statute, to make it a penal offense for a minister of the gospel, in his own church, or in a church where he was invited to preach, to voice vigorous protest when he and his religious followers (present on that occasion to hear him preach) were denounced to their faces as coming from "the lowest down scrapings of the earth" by a leader of a prayer-meeting, who, after offering a prayer and read-ing a chapter from the Bible, instead of commenting, as is usually done, upon the chapter just read, began to abuse and vilify the minister and his flock.

It is a fair inference from the record that there was a conflict between two rival religious denominations, as to which was entitled to carry on religious services at the chapel on the night in question. In *Woodall* v. *State*, 4 *Ga. App.* 783 (62 S. E. 485), it was said: "It is manifest from the record that there was conflict between two rival factions in the . . church, as to which was entitled to carry on religious services. . . The statute was never designed to be used as a means of settling, by criminal prosecution, the respective rights of contestants for the privilege of carrying on divine services at a particular time, or in a particular house of worship. . . It is beyond the power of the courts to settle by criminal prosecutions the respective rights of contesting claimants to a benefice." We think, under the circumstances, that the leader of the prayer-meeting, and not the preacher, was the one directly responsible for the disorder that followed the former's abuse of the latter. The defendant's conviction was contrary to the law and the evidence, and the court erred in overruling his motion for a new trial.

*Judgment reversed. Harwell, J., concurs. Bloodworth, J., dissents.*

BLOODWORTH, J., dissenting. The indictment in this case is based on section 412 of the Penal Code (1910), which is as follows: "Any person who shall, by cursing or using profane or obscene language, or by being intoxicated, or otherwise indecently acting, interrupt, or in any manner disturb, a congregation of persons lawfully assembled for divine service, and until they are dispersed from such place of worship, shall be guilty of a misdemeanor." The gist of the offense is interrupting or disturbing "a congregation of persons lawfully assembled for divine service." The evidence establishes, beyond dispute, that there was a congregation of persons lawfully assembled for divine service, and that the congregation was greatly disturbed. Indeed, the evidence shows that the meeting broke up in great confusion. One of the witnesses testified in part as follows: "We went there for the purpose of going to prayer meeting. I heard J. W. Jackson get up and read a verse from the Bible at the time Mr. O'Bryan was conducting prayer meeting there, and I heard him tell the congregation that all who believed in the preaching Mr. O'Bryan was preaching would go to hell, and then he turned to Mr. O'Bryan

and said, 'and you will go with them.' Mr. O'Bryan told Mr. Jackson to sit down, which he did. Later on, Mr. Jackson, while Mr. O'Bryan was talking about the doctrine that Mr. Jackson was preaching, asked Mr. O'Bryan to explain himself, and also to tell the truth. Mr. O'Bryan, because of the confusion of the congregation, told the people that because of the confusion they could consider themselves dismissed." Other witnesses testified to substantially the same thing. As I see the evidence, it establishes the guilt of the defendant beyond any reasonable doubt, and I cannot, therefore, agree with the above opinion of my associates.