ALBERT E. POPE, Claimant, *v.* STATE OF NEW YORK, Defendant.
(Claim No. 28242.)

Court of Claims, May 26, 1948.

*Raymond N. Bush* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Arthur W. Mattson, James G. Austin* and *Donald C. Glenn* of counsel), for defendant.

LOUNSBERRY, P. J. In 1920, Albert E. Pope, the claimant herein, then a boy, went for a swim in Onondaga Lake and contracted a serious skin disease, resulting, he believed, from pollution of the lake by waste products discharged into it by some corporation. He became and has ever since remained a crusader for the elimination of the pollution. By talks to individuals, speeches in Chamber of Commerce meetings and elsewhere, newspaper publicity, and letters to the Governor and others, he sought continually to bring attention and action to the subject of the lake pollution. He also took an active interest in other civic matters.

On July 11, 1946, there was scheduled at his home town of Liverpool a celebration for the purpose of dedicating a new trans-State highway known as the Thruway. An elaborate ceremony was arranged including a number of speeches, climaxed by an address by Governor Thomas E. Dewey, after which the Governor was scheduled to break ground for the project and to operate a bulldozer.

The scene of the celebration was the intersection, just outside the village of Liverpool proper, of the Thruway, running generally east and west, and Vine Street, running generally north and south. To the east of Vine Street a speaker's stand and bleachers were erected, while to the west of the street, and somewhat southerly a bulldozer was in readiness for the concluding ceremony.

Mr. Pope planned to attend this celebration and a little while before starting was seized with the notion of taking with him some signs concerning the lake pollution situation. He evidently hoped in this way to bring the problem to the attention of the Governor himself, and also of the other high officials and of the considerable crowd expected to be present. Accordingly he fashioned two cardboard signs, with wooden handles, four or more feet long, one reading " Oh! For A Healthy Swim! ", and the other, " We Invite ' Tom ' To The Re-Opening Of Onondaga Lake ". Thus equipped, and in company with his son, Albert, and a neighbor's boy, each boy carrying one of the signs, he attended the celebration, along with some 3,500 other persons.

Pope and the boys stationed themselves in the crowd at a point about forty to fifty feet southwesterly from the speaker's stand. It is undisputed that during the preliminaries and the speeches the signs were kept down out of sight, face to face, so that they could not be seen. When the Governor concluded his address the boys, at Pope's instruction, raised the signs above their heads, where they could be plainly seen from the speaker's platform, and also by many of the members of the crowd. There is a dispute as to whether the Governor was then on the platform or had already left it, but the point is not important to the decision.

A State police sergeant called the signs to the notice of his superior, Captain John F. Ronan, who was in charge of the State police detail at the celebration. Captain Ronan immediately ordered the signs removed, whereupon a State police sergeant and a deputy sheriff went to Pope, took hold of him, one under either arm, and virtually carried him out to Vine Street.

Pope then crossed Vine Street and began walking southerly toward his home, which brought him near the site of the bulldozer part of the ceremony. One Eric H. Nordheim, Jr., had joined him, and offered to and did carry one of the signs while Pope carried the other. They were held in substantially an

upright position, visible to onlookers. There were many persons about, watching the Governor operate the bulldozer, or walking along the highway.

Thus far there is no substantial dispute as to the occurrences of the day. From there on versions of subsequent events vary widely. According to Pope, substantiated by his son, who was still present, and by Nordheim, he had stopped to wait for the Governor's car to pass when he was suddenly pounced upon by Captain Ronan, who seized his arm in a vise-like grip, swung him around, and, his face flushed with anger, said "Give me those damn silly signs and follow me to my car", and thereupon grabbed one of the signs from Pope and the other from Nordheim and carried them away. Pope did not follow him to his car, and saw and heard nothing further of Ronan. His son, however, stated that Ronan subsequently smashed up the signs.

The State presents a very different account of the matter. Captain Ronan testified that while he was escorting the Governor and his party from the bulldozer to their cars he again observed the signs, held above the heads of the people, about twenty-five to thirty feet away and facing him. He walked over to Pope and Nordheim and asked them to give him the signs, which they did. He insisted that he did not touch either man, nor order them to follow him. He stated that he merely took the signs, carried them some ten or fifteen feet away and laid them on the ground, and that he did not smash them.

In corroboration of Captain Ronan's testimony the State produced nine apparently disinterested witnesses. Helen C. Hoar testified that she was perhaps fifty feet away from the signs, noticed Captain Ronan go toward the persons holding them, take the signs and drop them at the side of the road. She did not see Ronan touch either Pope or Nordheim. Helen Bardes stated that she was a little more than a car's length away, and saw Ronan take the signs. She likewise did not see him touch anyone. George J. Lehne, standing about thirty feet away, noticed Ronan approach the men, say something, and take the signs without touching anyone. There was no commotion. Herbert C. Whitney, standing about forty feet away, testified to the same effect.

Edward F. Dossert, who was two or three paces north of Pope and Nordheim, saw Ronan walk past him go up to them, and saw them surrender the signs. He heard no conversation, observed no commotion or disturbance, and did not see Ronan touch either man. Arthur F. Betsinger, who was about fifteen

feet away, gave substantially identical testimony. Rudolph V. Lehne noticed Pope, Nordheim, and Pope's son with the signs about thirty-five to forty feet away, saw Ronan approach them and talk with them, after which they handed over the signs. He was sure that Ronan did not touch Pope. Charles R. Seckner, standing somewhat closer, gave the same account. Olga Kelley happened to turn just in time to see the signs being handed over and noticed no disturbance nor saw Ronan touch anyone.

The claimant attempted to make an issue of the fact that all or nearly all of the foregoing State witnesses were either public officials, former public officials, or spouses of public officials, the implication being, of course, that they were under some sort of pressure to testify favorably to the cause of the State. We refuse to entertain any such suggestion. The court trusts that the holding of public office or employment has not yet fallen into such low esteem as to constitute an impeachment of the credibility of the office-holder and his family.

Pope alleges that he suffered a painful injury to his arm and great humiliation as a result of his encounter with Captain Ronan, leading to low blood pressure, insomnia, nausea, and general nervousness and weakness, lasting several months and causing him to lose considerable time from his work as a landscape gardener. Dr. Herman Harding, whom Pope consulted four days after the celebration, and who thereafter treated him for about six months, fully confirmed the existence of the foregoing conditions and definitely attributed them to the alleged assault by Ronan and the ensuing humiliation. Despite a vigorous cross-examination the State was unable to vitiate this testimony, and it produced no medical evidence of its own. Hence, it must be regarded as established that following his attendance at the Thruway celebration Pope did indeed suffer from the various conditions described.

It does not necessarily follow, however, that the claimant's various injuries resulted from his alleged encounter with Captain Ronan. The witness Nordheim testified that he found Pope nervous and humiliated when he joined him on Vine Street, which was after Pope's ejection from the crowd about the speaker's stand but before the Ronan incident. The arm injury might easily have been caused by the handling received by him at the hands of the State police sergeant and deputy sheriff upon that prior occasion. Certainly that experience, occurring in the sight of a large crowd, must have been humili-

ating. In short, for all that appears, Mr. Pope's subsequent troubles might with equal likelihood have resulted from his first adventure of the day.

The foregoing facts raise two principal questions. First, was the claimant guilty of any unlawful or dangerous conduct which would justify the police action which he charges occurred? The State contends that Pope's conduct constituted a violation or at least threatened to constitute a violation of sections 722 and 1470 of the Penal Law, and cites *People* v. *Nixon* (248 N. Y. 182), *People* v. *Hipple* (263 N. Y. 242) and *People* v. *Galpern* (259 N. Y. 279) in justification of the conduct attributed by the claimant to Captain Ronan.

Section 722 of the Penal Law provides, in part:

" *Disorderly conduct.*

" Any person who with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, commits any of the following acts shall be deemed to have committed the offense of disorderly conduct:   *   *   *.

" 2.  Acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others;

" 3.  Congregates with others on a public street and refuses to move on when ordered by the police;   *   *   *."

Section 1470 of the Penal Law provides:  " A person who without authority of law, wilfully disturbs any assembly or meeting, not unlawful in its character, is guilty of a misdemeanor."

We cannot agree that Pope's conduct in any manner constituted a violation or threatened violation of any of these provisions.   There was nothing in the content of the sign themselves in the least likely to incite a riot or cause any form of disturbance. The claimant did not interrupt the Governor's, or anyone else's, speech. No disturbance, other than the police action itself, resulted from the display of the signs. The State's own witnesses, including Captain Ronan, agreed that Pope's conduct was orderly and peaceable, and that the signs did not disturb or upset them.   Hence, we can discover no sufficient justification for the police action charged, assuming that it did in fact occur.   The claimant was merely exercising his constitutional rights of petition and freedom of speech in a somewhat unusual but perfectly lawful and orderly manner.

The case above mentioned all concern disorderly conduct based upon congregation in a public place and refusal to move on when ordered to do so by a police officer.   Nothing of

the sort occurred in the present case and, hence, they are of dubious relevancy. They do appear to permit a police officer considerable discretion in action to avert a threatened breach of the peace, but none of them authorizes the type of conduct charged by the claimant to Captain Ronan, in a situation such as the present one, where no breach of the peace could reasonably have been anticipated.

The second question is whether there was in fact any assault, false arrest, or false imprisonment, as charged by the claimant. Assault is an unlawful offer or attempt with force or violence to do corporal hurt to another, and when combined with an actual use of force constitutes assault and battery. " Arrest is the taking of a person into custody that he may be held to answer for a crime," (Code Crim. Pro., § 167) and is made " by an actual restraint of the person of the defendant, or by his submission to the custody of the officer." (Code Crim. Pro., § 171). False arrest is, of course, an unlawful arrest. False imprisonment is closely akin, being defined, in Black's Law Dictionary, as the unlawful arrest or detention of a person for any length of time, whereby he is deprived of his personal liberty.

In considering this question, it is important to bear in mind that Pope's entire claim is based on the incident with Captain Ronan occurring along Vine Street, after he had been ejected from the scene of the principal ceremonies. He makes no claim on the prior ejection. Hence, upon this matter, we can only consider the testimony as to the second episode.

The claimant's version of the facts, showing his seizure and detention by Captain Ronan, would undoubtedly establish assault, battery, false imprisonment, and perhaps also false arrest. The State's version would negative all of these charges. If, as the State's witnesses testify, Captain Ronan simply approached the claimant and requested delivery of the signs, which were voluntarily surrendered, and did not threaten, touch, arrest or detain him, the essential elements of the charges are missing. There was no threat, no battery, no arrest, no unlawful detention.

The question finally resolves itself, therefore, into the relative weight to be given the conflicting testimony concerning the Ronan incident. The testimony of the claimant, of his son, and of Nordheim is interested; that of the State's witnesses, except Ronan, disinterested. We have no reasonable ground for rejecting the testimony of the nine disinterested witnesses, and

we must therefore conclude that the claimant has failed to establish by a fair preponderance of the evidence the facts necessary to prove any or all of his allegations as to assault, false arrest, or false imprisonment, rather, the preponderance of the evidence is to the contrary.

As we have already indicated, the claimant has elected to base his entire claim for physical injury, humiliation and ensuing complications upon the alleged assault, arrest and imprisonment by Captain Ronan. If the latter did not occur, the injuries, humiliation and other afflictions, however real, could not have resulted from them. They may well have resulted from other events of the day, but the claimant does not so allege. The claim must therefore be dismissed.

Findings of fact and conclusions of law may be submitted within ten days after the filing of this memorandum, otherwise this opinion will be considered the decision.

Let judgment be entered accordingly.