1 Cal.3d 930 (1970)
464 P.2d 142
83 Cal. Rptr. 686
In re THOMAS PATRICK KAY et al., on Habeas Corpus.
Docket No. Crim. 13533.
Supreme Court of California. In Bank.
January 30, 1970.
*933 COUNSEL
Joe C. Ortega for Petitioners.
A.L. Wirin, Fred Okrand, Laurence R. Sperber and Tony Geram as Amici Curiae on behalf of Petitioners.
Byron C. Morton, District Attorney, and Ross I. Gallen, Deputy District Attorney, for Respondent.
*934 OPINION
TOBRINER, J.
Petitioners James Caswell,[1] Thomas Patrick Kay, Alfred Figueroa, and Raul Loya were convicted by a jury of disturbing a lawful meeting, a misdemeanor, in violation of section 403 of the Penal Code. Petitioners appealed to the appellate department of the superior court, which affirmed their conviction. The appellate department, at petitioners' request, certified the case to the Court of Appeal. The Court of Appeal refused certification. Petitioners, who had been sentenced to four months in jail,[2] then sought a writ of habeas corpus from this court, claiming that *935 their convictions violated the guarantees of free speech and due process of law in the federal and state Constitutions. We issued an order to show cause, and ordered petitioners released on their own recognizance pending our determination of this proceeding.
We now conclude that petitioners' conduct does not fall within the constitutionally compelled meaning of section 403, and that the writ should therefore issue.

I. The Facts

City officials scheduled a celebration of Independence Day for July 4, 1968, in Dateland Park in the City of Coachella. They invited as a speaker, among others, Congressman John Tunney, a candidate for Congress in the November 1968 congressional election. Because he had declined to support a widely publicized consumer boycott of non-union table grapes, Congressman Tunney had become a controversial figure. Coachella, located in the center of one of the major grape producing areas of the state, includes in its population a large number of Mexican-Americans, many of whom apparently supported the boycott, and on this matter disagreed with Congressman Tunney. Although certainly aware of the controversy surrounding Mr. Tunney, the organizers of the celebration decided to invite him to speak. Apparently neither Mr. Tunney's opponent in the November election nor the nationally known leader of the farm workers union was asked to participate in the celebration.
On July 4 petitioners went to the celebration together with some 6,000 other persons, none of whom, so far as appears from the record, had any prior connection with petitioners. When petitioners arrived, police officials in charge of controlling the crowd contacted them and, upon inquiry, told them that they could protest Congressman Tunney's speech so long as they did so in a nonviolent manner. Petitioners and the rest of the audience courteously listened to a number of speakers preceding Congressman Tunney.
*936 Congressman Tunney spoke last and immediately prior to the fireworks. He discussed a number of political topics,[3] although he does not appear to have mentioned the grape boycott or the farm workers.
After Congressman Tunney had given a portion of his speech, a comparatively small part of the total crowd, between 25 and 250 persons, engaged in rhythmical clapping and some shouting for about five or ten minutes. This demonstration did not affect the program. Congressman Tunney, who had been using a microphone, finished his speech despite the protest, pausing to assure those protesting that they had a right to do so and to urge them to be grateful that they live in a country whose Constitution protects their right to demonstrate in that manner. At no time did either the speaker or the police ask the protestors to be silent or to leave. Following the end of the protest and of the congressman's speech, the fireworks were shown. The police made no arrests during or immediately following the protest; the prosecution filed charges only some two weeks later.
At the trial the prosecution and petitioners differed as to their versions of the role of the protestors in the incident. Prosecution witnesses stated that all four petitioners had joined in the clapping. Petitioners Caswell, Loya, and Figueroa, testifying on their own behalf, denied that they had clapped, although petitioner Loya admitted that he had shouted slogans and applauded Congressman Tunney's statement as to the constitutional right to protest. Petitioner Figueroa admitted having waved a flag bearing an emblem used by the farm workers. The protest appears to have been a spontaneous demonstration in support of the farm workers and in opposition to Congressman Tunney's position. No evidence indicated that the incident had been planned or organized by petitioners, the farm workers, or anyone else.
The effect of the protest on the audience does not appear to have been substantial. Of 10 members of the audience who testified at the trial, *937 only three stated that they had been unable to hear Congressman Tunney. Two of these, a police officer and an official of the celebration, admitted their auditory inability had occurred only after they had deliberately approached the protesting group to investigate the incident. The third witness who stated that she had not been able to hear, also an official of the celebration committee, admitted that she had purposely stood only a few feet from the protesting group although she might have walked to another part of the park where the speech would have been more audible. Two other witnesses, a police officer and a city councilman, both of whom had been sitting behind Congressman Tunney on the speaker's platform, stated that they had been unable to hear some parts of the address. The prosecution offered no evidence as to the difficulty, if any, of hearing the congressman's speech at any place in the park other than on the speaker's platform, where the amplifying equipment may or may not have been helpful. Five other witnesses, including the city manager, the master of ceremonies, and Congressman Tunney's field representative, testified that they had encountered no difficulty in hearing the speech.
Four witnesses who were called by the prosecution stated that they had been "disturbed" by the protest. Three of these were officials in charge of the celebration, who may have been "disturbed" merely because an element of controversy had been introduced into the meeting. We cannot determine from the record whether any of these witnesses opposed the unionization of the farm workers and thus suffered disturbance because of the content of the slogans and the plain meaning of the clapping. Congressman Tunney's field representative, Douglas Waylon, stated that he had not been disturbed by the protest[4] and that he felt that such protests were not unusual, though commonly reserved for presidents. Dr. Francis Carney, testifying as an expert on American political history, stated that such clapping and shouting lies "within the range of normal and acceptable political demonstrations in American politics," and listed numerous incidents in which such political speakers had been greeted in a similar manner.
Police officials testified that at no time during the nonviolent protest did they fear for injury to persons or property.

II. The application of section 403 involves competing First Amendment interests

Section 403 of the Penal Code provides: "Every person who, without authority of law, willfully disturbs or breaks up any assembly or meeting, *938 not unlawful in its character, ... is guilty of a misdemeanor." With one exception, not relevant here, the section has not been interpreted by a California court since its enactment almost a century ago. (See Farraher v. Superior Court (1919) 45 Cal. App. 4 [187 P. 72].)
(1) We initially recognize that in analyzing the application of section 403 to the facts of this case, and, more generally, to comparable situations, we must be guided by the constitutional doctrines governing statutory regulations affecting First Amendment rights. "Disturbances" of meetings arise in a wide variety of forms; the modern techniques of the "politics of peaceful confrontation" frequently result in a clash of ideological expressions which may, in many senses, "disturb" a meeting. Without doubt petitioners' conduct in the instant case, including clapping (Edwards v. South Carolina (1963) 372 U.S. 229, 233 [9 L.Ed.2d 697, 700, 83 S.Ct. 680]), cheering and shouting (Cox v. Louisiana (1965) 379 U.S. 536, 546 [13 L.Ed.2d 471, 479, 85 S.Ct. 453]), and flag waving (Stromberg v. California (1931) 283 U.S. 359, 362 [75 L.Ed. 1117, 1119, 51 S.Ct. 532, 73 A.L.R. 1484]), was "closely akin to `pure speech'" (Tinker v. Des Moines Independent Community School Dist. (1969) 393 U.S. 503, 505 [21 L.Ed.2d 731, 736, 89 S.Ct. 733]). The imposition of criminal sanctions for such conduct under section 403 clearly raises the serious question of the constitutionally permissible bounds of this provision. We turn to an examination of the applicable competing constitutional principles.
Under most circumstances, of course, ordinary good taste and decorum would dictate that a person addressing a meeting not be interrupted or otherwise disturbed. The Constitution does not require that any person, however lofty his motives, be permitted to obstruct the convention or continuation of a meeting without regard to the implicit customs and usage or explicit rules governing its conduct. (Gregory v. Chicago (1969) 394 U.S. 111, 125 [22 L.Ed.2d 134, 143-144, 89 S.Ct. 946] (Black, J., concurring); Kovacs v. Cooper (1949) 336 U.S. 77, 81, 97 [93 L.Ed. 513, 519, 527, 69 S.Ct. 448, 10 A.L.R.2d 608].) The constitutional guarantees of the free exercise of religious opinion, and of the rights of the people peaceably to assemble and petition for a redress of grievances, would be worth little if outsiders could disrupt and prevent such a meeting in disregard of the customs and rules applicable to it. (Compare Wall v. Lee (1865) 34 N.Y. 141, 145.) This inhibition does not mean, however, that the state can grant to the police a "roving commission" to enforce Robert's *939 Rules of Order,[5] since other First Amendment interests are likewise at stake.
Audience activities, such as heckling, interrupting, harsh questioning, and booing, even though they may be impolite and discourteous, can nonetheless advance the goals of the First Amendment. For many citizens such participation in public meetings, whether supportive or critical of the speaker, may constitute the only manner in which they can express their views to a large number of people; the Constitution does not require that the effective expression of ideas be restricted to rigid and predetermined patterns. (NAACP v. Button (1963) 371 U.S. 415, 431 [9 L.Ed.2d 405, 417, 83 S.Ct. 328].) A cogent remark, even though rudely timed or phrased, may "contribute to the free interchange of ideas and the ascertainment of truth." (Garrison v. Louisiana (1964) 379 U.S. 64, 73 [13 L.Ed.2d 125, 132, 85 S.Ct. 209]; see Gaddis v. State (1920) 105 Neb. 303 [180 N.W. 590, 591, 12 A.L.R. 648].) An unfavorable reception, such as that given Congressman Tunney in the instant case, represents one important method by which an officeholder's constituents can register disapproval of his conduct and seek redress of grievances. The First Amendment contemplates a debate of important public issues (New York Times Co. v. Sullivan, supra, 376 U.S. 254, 270 [11 L.Ed.2d 686, 700, 84 S.Ct. 710, 95 A.L.R.2d 1412]); its protection can hardly be narrowed to the meeting at which the audience must passively listen to a single point of view. The First Amendment does not merely insure a marketplace of ideas in which there is but one seller. (Compare Lamont v. Postmaster General (1965) 381 U.S. 301, 308 [14 L.Ed.2d 398, 403, 85 S.Ct. 1493] (Brennan, J., concurring).)
The very possibility of adverse audience reaction may aid in the correction of evils which would otherwise escape opposition. Government officials might attempt to advance a partisan political cause by forcing the audience at a publicly financed event, such as a display of fireworks, to listen first to speakers of a particular persuasion. (Compare Red Lion Broadcasting Co. v. Federal Communications Com. (1969) 395 U.S. 367 [23 L.Ed.2d 371, 89 S.Ct. 1794, 1807-1808]; Cox v. Louisiana, supra, 379 U.S. 536, 557-558 [13 L.Ed.2d 471, 485-486, 85 S.Ct. 453].) An astute and disputatious audience could deter such practices. Although a public official usually occupies a far better position than the ordinary citizen to publicize his views by the communications media,[6] those who *940 disagree with such an official may be able to proclaim disagreement by criticism to his face. Audience response, moreover, may force a speaker to discuss a difficult issue that he may wish to avoid, or to explain some past conduct that he hopes will be forgotten.
The public interest in an active and critical audience has long been recognized. The heckling and harassment of public officials and other speakers while making public speeches is as old as American and British politics;[7] here, as in Great Britain, such protestant conduct has been thought to lie outside the realm of legal regulation except in the most egregious of cases. Justice Black, dissenting in Feiner v. New York (1951) 340 U.S. 315, 325-326 [95 L.Ed 295, 302-303, 71 S.Ct. 303], remarked: "It is neither unusual or unexpected that some people at public street meetings mutter, mill about, push, shove, or disagree, even violently, with the speaker. Indeed, it is rare where controversial topics are discussed that an outdoor crowd does not do some or all of these things." In Payroll Guar. Assn. v. Board of Education (1945) 27 Cal.2d 197, 202-203 [163 P.2d 433, 16 A.L.R. 1300], we stated: "Speakers who express their opinions freely must run the risk of attracting opposition; they cannot expect their opponents to be silenced while they continue to speak freely." In Landry v. Daley (N.D. Ill. 1968) 280 F. Supp. 968, 970, the court commented: "Political campaigns, athletic events, public meetings and a host of other activities produce loud, confused or senseless shouting not in accord with fact, truth, or right procedure to say nothing of not in accord with propriety, modesty, good taste or good manners. The happy cacophany of democracy would be stilled if all `improper noises' in the normal meaning of the term were suppressed."[8]

*941 III. The permissible scope of section 403

Since the Constitution indubitably affords some measure of protection to the free expression of all those present at a meeting  speakers, officials, and audience  section 403's prohibition of "disturbances" potentially may collide with safeguarded First Amendment interests. (2a) Nonetheless, the state retains a legitimate concern in ensuring that some individuals' unruly assertion of their rights of free expression does not imperil other citizens' rights of free association and discussion. (See Kovacs v. Cooper (1949) 336 U.S. 77, 86 [93 L.Ed. 513, 521, 69 S.Ct. 448, 10 A.L.R.2d 608].) Freedom of everyone to talk at once can destroy the right of anyone effectively to talk at all. Free expression can expire as tragically in the tumult of license as in the silence of censorship. (See Red Lion Broadcasting Co. v. Federal Communications Com., supra, 395 U.S. 367 [23 L.Ed.2d 371, 89 S.Ct. 1794, 1805, 1810, fn. 23]; cf. Kovacs v. Cooper, supra, 336 U.S. 77, 81 [93 L.Ed. 513, 519, 69 S.Ct. 448, 10 A.L.R.2d 608] (ordinance prohibiting sound trucks emitting "loud and raucous" noises upheld; "[u]nrestrained use throughout a municipality of all sound amplifying devices would be intolerable.").)
(3) We recognize, of course, that because "the `threat of sanctions may deter almost as potently as the application of sanctions'" (Burton v. Municipal Court (1968) 68 Cal.2d 684, 691 [68 Cal. Rptr. 721, 441 P.2d 281]), "constitutionally permissible restrictions upon the exercise of First Amendment rights ... must be drawn with a narrow specificity calculated to prevent repression of expressive activities as to which restriction is constitutionally forbidden." (In re Berry (1968) 68 Cal.2d 137, 155 [65 Cal. Rptr. 273, 436 P.2d 273]; see, e.g., Dombrowski v. Pfister (1965) 380 U.S. 479, 486-487 [14 L.Ed.2d 22, 28-29, 85 S.Ct. 1116]; NAACP v. Button (1963) 371 U.S. 415, 432-433 [9 L.Ed.2d 405, 417-418, 83 S.Ct. 328].)
On its face, section 403 applies to "every person who ... willfully disturbs or breaks up any assembly or meeting ...," and if the section were literally applied with the breadth of coverage that its terms could encompass, the statute would be constitutionally overbroad and could not stand. (4a) In the instant case, in instructing the jury, the trial court simply read, verbatim, the language of section 403. In such a broad unrestricted rendition the court invited the jury to apply the statute unconstitutionally and to find individuals guilty of nothing more than an expression of free speech protected by the Constitution. Thus the jury, under such an instruction, might convict persons whose expressive conduct "disturb[ed]" a meeting only because the content of the expression conflicted with the views espoused by the meeting's organizers or official speakers. The right to free expression articulated through "disturbances" that are no more than *942 announced differences in ideology or beliefs lies at the heart of the First Amendment; governmental prohibition of such activity, under any statutory scheme, could not constitutionally be countenanced. (See Terminiello v. Chicago (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 1134, 69 S.Ct. 894].)
As the United States Supreme Court made clear in Terminiello, in overturning an ordinance which prohibited, as a breach of the peace, "misbehavior which violates the public peace and decorum ... if it stirs the public to anger, invites disputes, brings about a condition of unrest or creates a disturbance.[9] ... [A] function of free speech under our system of government is to invite disputes. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudice and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." Without judicial interpretation, the statute is therefore susceptible of an unconstitutionally overbroad application.
(5) We must, however, presume that the Legislature intended to enact a valid statute; we must, in applying the provision, adopt an interpretation that, consistent with the statutory language and purpose, eliminates doubts as to the provision's constitutionality. (City of Los Angeles v. Belridge Oil Co. (1957) 48 Cal.2d 320, 324 [309 P.2d 417]; Miller v. Municipal Court (1943) 22 Cal.2d 818, 828 [142 P.2d 297].) (6) Accordingly, we now explicitly recognize that, in light of the purposes of the provision and the competing First Amendment interests at stake, section 403 authorizes the imposition of criminal sanctions only when the defendant's activity itself  and not the content of the activity's expression  substantially impairs the effective conduct of a meeting.
*943 (7a) To effectuate section 403 within constitutional limits we interpret it to require the following showing to establish its transgression: that the defendant substantially impaired the conduct of the meeting by intentionally committing acts in violation of implicit customs or usages or of explicit rules for governance of the meeting, of which he knew, or as a reasonable man should have known.
In applying these standards, the nature of a meeting necessarily plays a major role. (Cf. State v. McNair (1965) 178 Neb. 763 [135 N.W.2d 463].) The customs and usages at political conventions may countenance prolonged, raucous, boisterous demonstrations as an accepted element of the meeting process; similar behavior would violate the customs and usages of a church service. Audience participation may be enthusiastically welcomed at a bonfire football rally or an athletic contest, but considered taboo at a solemn ceremony of a fraternal order. Explicit rules governing the time and place of permitted nonviolent expressions (cf. Gaddis v. State, supra, 180 N.W. 590; State v. Stuth, supra, 39 P. 665) may in some circumstances fix the limits of permissible conduct. Violation of such customs or rules by one who knew or as a reasonable man should have known of them would justify the application of section 403.[10] Thus, rather than enacting monolithic standards, section 403 draws its content from the implicit customs and usages or explicit rules germane to a given meeting.
(8a) In the instant case the application of section 403 must in the first instance be examined in the light of the nature of the meeting involved here: a large, public celebration held outdoors in a public park, featuring, in the course of a political campaign, a public official as the principal speaker. Informality characterized this public rally: people could come and go as they pleased; members of the audience could move at will to other *944 areas of the "meeting." By custom and usage nonviolent demonstrations of political views are reasonably to be expected at such a gathering. As the evidence at trial disclosed, our history reveals that heckling and disputatious remarks at such affairs are commonplace occurrences. Indeed, the principal speaker at the rally, an elected public official, stated that the relevant custom sanctioned the demonstrative conduct of petitioners as a legitimate means of expression. The prosecution offered no evidence that clapping, flag waving, and sloganeering are not generally accepted and permitted at a public meeting, addressed by controversial elected officials, such as the instant one. Since the nature of that meeting contemplated acceptance of the nonviolent expression of alternative viewpoints, the petitioners' protest did not impair the conduct of the meeting but instead constituted a legitimate element of it.
Moreover, the prosecution failed to show that the activities substantially impaired the conduct of the meeting. Not every violation of a general custom or of an explicit meeting rule becomes so grave as to warrant application of criminal sanctions; nor does section 403 contemplate such extensive coverage. (Cf. State v. McNair (1965) 178 Neb. 763 [135 N.W.2d 463]; People v. Malone (1913) 156 App. Div. 10 [29 N.Y. Crim. 325, 141 N.Y.S. 149].)[11] (2b) The free expression that our constitutional form of government so highly values may not be subjected to regulation by state action in the absence of an important state interest. (Tinker v. Des Moines Independent Community School Dist. (1969) 393 U.S. 503, 508-509 [21 L.Ed.2d 731, 738-739, 89 S.Ct. 733].)
(9) Whether a given instance of misconduct substantially impairs the effective conduct of a meeting depends upon the actual impact of that misconduct on the course of the meeting; the question cannot be resolved merely by asking persons present at the meeting whether they were "disturbed." (See Morris v. State (1888) 84 Ala. 457 [4 So. 628]; Calvert v. State (1883) 14 Tex. Crim. App. 154.) (8b) In the instant case, the questioned conduct continued for only a few minutes, Congressman Tunney was able to complete his speech, and it does not appear that a large part of the audience could not hear his remarks. We conclude that the state *945 failed to meet its burden of establishing a substantial impairment of the conduct of the meeting.
Finally, we do not believe that there was a sufficient showing that the defendants disturbed the meeting within the constitutionally permissible limits of the statutory term "disturb." Generally, if disturbances are occasioned by nonviolent exercise of free expression, section 403 will require that defendants be shown to have engaged in such conduct with knowledge, or under circumstances in which they should have known, that they were violating an applicable custom, usage, or rule[12] of the meeting. (10) In instances in which the appropriate standard of conduct lies in doubt, a warning and a request that defendants curtail their conduct, either by officials or law enforcement agents, should precede arrest or citation.[13] If section 403 were not so interpreted, individuals would be forced to speculate as to what conduct might entail criminal sanctions and would "necessarily ... `steer far wider of the unlawful zone.'" (Keyishian v. Board of Regents (1966) 385 U.S. 589, 604 [17 L.Ed.2d 629, 641, 87 S.Ct. 675]; see Interstate Circuit v. Dallas (1968) 390 U.S. 676, 684 [20 L.Ed.2d 225, 232, 88 S.Ct. 1298]; Baggett v. Bullitt (1964) 377 U.S. 360, 372 [12 L.Ed.2d 377, 385, 84 S.Ct. *946 1316]; Speiser v. Randall (1958) 357 U.S. 513, 526 [2 L.Ed.2d 1460, 1472, 78 S.Ct. 1332].) The chilling effect on the protected expression of participants at a meeting that would be engendered by a less stringent reading of section 403 would raise serious questions concerning the provision's constitutionality.[14]
(8c) Given the general customs, usages, and rules applicable to the large public meeting in the instant case, petitioners may well have been attempting only to express a particular political point of view in a peaceful manner appropriate to the occasion. No evidence adduced at trial supported the conclusion that petitioners intended substantially to impair the conduct of the meeting. After petitioners began their nonviolent activity, neither the leaders of the meeting nor any other officials notified them that their actions were inappropriate for the public gathering or substantially impaired the conduct of the meeting. No one instructed, or even requested, petitioners to cease their activity; indeed, Congressman Tunney's remarks during the meeting explicitly, and correctly, encouraged petitioners to believe that their conduct was constitutionally protected. Under these circumstances, we cannot find that petitioners disturbed the meeting within the meaning of section 403.
Our accommodation of the competing constitutional postulates will serve to preserve both section 403 and the constitutional protections. It prevents so excessive a use of the First Amendment right to protest that the right would be devoured in its own excesses. (7b) Thus, participants at a meeting may express disagreement but must not violate explicit rules or implicit customs and usages, pertaining to the meeting, of which they knew or should have known; such activity, when it is intentional and when it substantially impairs the conduct of a meeting, violates section 403.
In view of the foregoing discussion of the scope of section 403, we need not decide whether, without such definition, the statute would be void for vagueness.[15] (4b, 8d) Although in instructing the jury on the necessary elements of a violation of section 403, the trial court erred in failing to designate the constitutionally compelled limits of the broad statutory language as discussed above, we do not remand the case for a new trial *947 since we conclude that section 403 cannot constitutionally be applied so as to reach the facts in the instant case. Accordingly, habeas corpus is an appropriate remedy. (In re Zerbe (1964) 60 Cal.2d 666, 668 [36 Cal. Rptr. 286, 388 P.2d 182, 10 A.L.R.3d 840].) Inasmuch as section 403 does not apply to petitioners' conduct, we need not determine whether the penalty assessed in the case at bar was unconstitutional because so severe as to chill legitimate activity.[16]
The writ is granted. The judgment against petitioners is set aside.
Traynor, C.J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.
McCOMB, J.
I dissent. I would deny the writ.
NOTES
[1] During the pendency of proceedings in this case the court received a certified copy of the certificate evidencing the death of James Caswell on November 18, 1969. Mr. Caswell was the first of the four named petitioners in these proceedings when the court issued an order to show cause on July 16, 1969. Hence the proceedings before this court were originally entitled In re James Caswell et al. on Habeas Corpus. On January 13, 1970, the court dismissed the proceedings with respect to James Caswell as moot. We now entitle the same proceedings In re Thomas Patrick Kay et al. on Habeas Corpus, since Mr. Kay is the second named petitioner.
[2] The sentence was far more severe than any we have been able to discover in other prosecutions for disturbing a meeting, even though the conduct in the instant case was far from egregious. (See e.g., McLain v. Matlock (1856) 7 Ind. 525 [65 Am. Dec. 746] ($5 fine); Gaddis v. State (1920) 105 Neb. 303 [180 N.W. 590, 12 A.L.R. 648] ($15 fine plus costs); Clark v. State (Tex. Crim. App. 1904) 78 S.W. 1078 ($25 fine); Calvert v. State (1883) 14 Tex. Crim. App. 154 ($25 fine); Lovett v. State (1925) 31 Okla. Crim. 378 [239 P. 274] ($100 fine); Literell v. Commonwealth (1936) 266 Ky. 235 [98 S.W.2d 909] ($300 fine); State v. Stuth (1895) 11 Wash. 423 [39 P. 665] (unstated fine); Brown v. State (1871) 46 Ala. 175 (unstated fine); Marvin v. State (1862) 19 Ind. 181 (unstated fine).) Sentences of this severity have, virtually without exception, been reserved for violent conduct; peaceful breaches of time and place regulations are generally penalized by no more than a small fine. (See, e.g., Edwards v. South Carolina (1963) 372 U.S. 229 [9 L.Ed.2d 697, 83 S.Ct. 680] (civil rights demonstration on public street; fines of $10 to $100, convictions reversed); Talley v. California (1960) 362 U.S. 60 [4 L.Ed.2d 559, 80 S.Ct. 536] (failure to put name of author on handbill, $10 fine, conviction reversed); Poulos v. New Hampshire (1953) 345 U.S. 395 [97 L.Ed. 1105, 73 S.Ct. 760, 30 A.L.R.2d 987] (holding religious meeting in public park without license, $20 fine, conviction affirmed); Fowler v. Rhode Island (1953) 345 U.S. 67 [97 L.Ed. 828, 73 S.Ct. 526] (using public park for religious meeting, $5 fine, convictions reversed); Kunz v. New York (1951) 340 U.S. 290 [95 L.Ed. 280, 71 S.Ct. 312] (holding meeting without permit, $10 fine, conviction reversed); Niemotko v. Maryland (1951) 340 U.S. 268 [95 L.Ed. 267, 71 S.Ct. 325] (holding meeting without permit, fine of $25 plus costs, conviction reversed); Terminiello v. Chicago (1947) 337 U.S. 1 [93 L.Ed. 1131, 69 S.Ct. 894] (fighting words, $100 fine, conviction reversed); Kovacs v. Cooper (1948) 336 U.S. 77 [93 L.Ed. 513, 69 S.Ct. 448, 10 A.L.R.2d 608] (loud and raucous sound truck, $50 fine, conviction affirmed); Marsh v. Alabama (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276] (distributing leaflets in company town, conviction reversed) ($50 fine, see Marsh v. State (1945) 32 Ala.App. 24 [21 So.2d 558]); Martin v. Struthers (1943) 319 U.S. 141 [87 L.Ed. 1313, 63 S.Ct. 862, 882] (violation of law forbidding door-to-door peddling, $10 fine, conviction reversed); Murdock v. Pennsylvania (1943) 319 U.S. 105 [87 L.Ed. 1292, 63 S.Ct. 870, 891, 146 A.L.R. 81] (peddling religious books without a license, fine of unstated amount, conviction reversed); Largent v. Texas (1943) 318 U.S. 418 [87 L.Ed. 873, 63 S.Ct. 667] (distribution of handbills without permission of mayor, $100 fine, conviction reversed); Jamison v. Texas (1943) 318 U.S. 413 [87 L.Ed. 869, 63 S.Ct. 669] (violation of ban on distribution of leaflet on public street, fine of $5 and costs, conviction reversed); Jones v. Opelika (1942) 316 U.S. 584 [86 L.Ed. 1691, 62 S.Ct. 1231, 141 A.L.R. 514] (selling books without license, reversed) (fine of unstated amount, see Cole v. City of Fort Smith (1941) 202 Ark. 614 [151 S.W.2d 1000]); Schneider v. Irvington (1939) 308 U.S. 147 [84 L.Ed. 155, 60 S.Ct. 146] (violation on ban on public distribution of leaflets, convictions reversed) (fines of $5, see Commonwealth v. Nichols (1938) 301 Mass. 584 [18 N.E.2d 166], and $25, see People v. Young (1938) 33 Cal. App.2d Supp. 747 [85 P.2d 231]); Lovell v. Griffin (1938) 303 U.S. 444 [82 L.Ed. 949, 58 S.Ct. 666] (distribution of literature without permission of city manager, $50 fine, conviction reversed); Davis v. Massachusetts (1897) 167 U.S. 43 [42 L.Ed. 71, 17 S.Ct. 731] (holding meeting without a permit, fine of unstated amount, conviction affirmed).
[3] Since Congressman Tunney's appearance at the celebration before a large number of his constituents predated the upcoming election by only a few months, it would be "blinking reality not to acknowledge" that the July 4 speech was part of his political campaign. (Compare Baggett v. Bullitt (1964) 377 U.S. 360, 373 [12 L.Ed.2d 377, 386, 84 S.Ct. 1316].) The debate protected by the First Amendment involves public figures as well as public issues (Rosenblatt v. Baer (1965) 383 U.S. 75, 85 [15 L.Ed.2d 597, 605, 86 S.Ct. 669]). "[P]ublic men, are, as it were, public property" when they seek to address a public gathering (New York Times Co. v. Sullivan (1964) 376 U.S. 254, 268 [11 L.Ed.2d 686, 699, 84 S.Ct. 710, 95 A.L.R.2d 1412]); they must be prepared to withstand at such times the protest and controversy which their earlier actions and statements have generated. (See Payroll Guar. Assn. v. Board of Education (1945) 27 Cal.2d 197, 202-203 [163 P.2d 433, 161 A.L.R. 1300].) Nor can such public figures silence demonstrations of disagreement by speaking solely of non-controversial matters. (See Rosenblatt v. Baer, supra, 383 U.S. 75, 87, fn. 14 [15 L.Ed.2d 597, 606, 86 S.Ct. 669].)
[4] Petitioners appended to their petition an affidavit signed by Congressman Tunney stating that he had not been disturbed by the demonstration. Respondents appended to their return affidavits of several persons who saw Congressman Tunney during or just after the demonstration, and who stated that they believed he was disturbed. These affidavits, which were not presented to the trial court, do not bear on the propriety or constitutionality of petitioners' convictions in view of our construction of section 403.
[5] Compare Interstate Circuit, Inc. v. Dallas (1968) 390 U.S. 676, 688 [20 L.Ed.2d 225, 234, 88 S.Ct. 1298]; Shuttlesworth v. Birmingham (1969) 394 U.S. 147, 153 [22 L.Ed.2d 162, 168, 89 S.Ct. 935]; Cox v. Louisiana (1965) 379 U.S. 559, 579 [13 L.Ed.2d 487, 501, 85 S.Ct. 476] (Black, J., concurring); Saia v. New York (1948) 334 U.S. 558, 561 [92 L.Ed. 1574, 1577, 68 S.Ct. 1148].
[6] See Rosenblatt v. Baer, supra, 383 U.S. 75, 88 [15 L.Ed.2d 597, 606, 86 S.Ct. 669] (Douglas, J., concurring); New York Times Co. v. Sullivan, supra, 376 U.S. 254, 304-305 [11 L.Ed.2d 686, 722-723, 84 S.Ct. 710, 95 A.L.R.2d 1412] (Goldberg, J., concurring); Kovacs v. Cooper (1949) 336 U.S. 77, 102 [93 L.Ed. 513, 530, 69 S.Ct. 448, 10 A.L.R.2d 608] (Black, J., dissenting); Barron, Access to the Press  A New First Amendment Right (1967) 80 Harv.L.Rev. 1641.
[7] See University Committee to End War in Vietnam v. Gunn (W.D. Tex. 1968) 289 F. Supp. 469 (President Johnson); Pope v. State (1948) 192 Misc. 587 [79 N.Y.S.2d 466] (Governor Dewey); People v. Malone (1913) 156 App.Div. 10, [29 N.Y. Crim. 325, 141 N.Y.S. 149] (Governor Wilson).
[8] Bishop, in his Treatise on Criminal Law, expressed the view that statutory and common law prohibitions against disturbing meetings were directed primarily towards protection of religious meetings, and that "[n]ot many disturbances of a political ... gathering will wound the feelings sufficiently to lead to criminal prosecutions." (§ 310b.) Those prohibitions have been interpreted to permit members of an audience to "boo" an incompetent actor (Clifford v. Brandon (1810) 170 Eng.Rep. 1183, 1187; Gregory v. Duke of Brunswick (1843) 174 Eng.Rep. 696, 699), to object to a preacher teaching doctrines contrary to those accepted by his and their church (Gaddis v. State (1920) 105 Neb. 303 [180 N.W. 590, 12 A.L.R. 648]; Jackson v. State (1918) 21 Ga. App. 779 [95 S.E. 302]; State v. Dahlstrom (1903) 90 Minn. 72 [95 N.W. 580]), and to reply to vicious personal attacks by the speaker (Lovett v. State (1925) 31 Okla. Crim. 378 [239 P. 274]).
[9] Numerous criminal provisions, interpreted to authorize the imposition of penalties on individuals who create "disturbances" or engage in similar activity, have been overturned by the courts as unconstitutionally vague. (E.g., Ashton v. Kentucky (1966) 384 U.S. 195, 198 [16 L.Ed.2d 469, 471, 86 S.Ct. 1407] (common law crime of criminal libel, defined by trial court as including "any writing calculated to create disturbances of the peace"); Cox v. Louisiana, supra, 379 U.S. 536, 551-552 [13 L.Ed.2d 471, 482-483, 85 S.Ct. 453] ("breach of peace" offense defined as "to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet"); Edwards v. South Carolina, supra, 372 U.S. 229, 234-236 [9 L.Ed.2d 697, 701-702, 83 S.Ct. 680] ("breach of peace" defined as "a violation of public order, a disturbance of the public tranquility ..."); Cantwell v. Connecticut (1940) 310 U.S. 296, 308 [84 L.Ed. 1213, 1220, 60 S.Ct. 900, 128 A.L.R. 1352] ("breach of the peace" statute covering "acts and words"); Landry v. Daley (N.D. Ill. 1968) 280 F. Supp. 968, 969 ("disorderly conduct" ordinance proscribing, inter alia, "mak[ing], aid[ing], countenanc[ing], or assist[ing] in making any ... disturbance"); cf. People v. Huss (1966) 241 Cal. App.2d 361, 365 [51 Cal. Rptr. 56] ("disturbance of the peace" violation encompassing "any act ... which by causing consternation and alarm, disturbs the peace and quiet of the community").)
[10] When, as in the instant case, the meeting is sponsored or organized by some state or local government agency, the government of course may not establish meeting rules inconsistent with the guarantees of the First Amendment, and section 403 cannot be used to enforce such rules. Thus armbands (Tinker v. Des Moines Independent Community School Dist., supra, 393 U.S. 503), flags (Stromberg v. California (1931) 283 U.S. 359 [75 L.Ed. 1117, 51 S.Ct. 532, 73 A.L.R. 1484]), hand-held signs (University Committee to End War in Vietnam v. Gunn, supra, 289 F. Supp. 469), topical buttons (Burnside v. Byars (5th Cir.1966) 363 F.2d 744), and leafletting (see Fowler v. State (1956) 93 Ga. App. 883 [93 S.E.2d 183]) cannot be prohibited, and if any audience participation is permitted the rules regulating who may speak cannot be used to silence a participant merely because his views happen to be unpopular with the audience or with the government sponsors of the meeting. (Cox v. Louisiana, supra, 379 U.S. 536, 552 [13 L.Ed.2d 471, 482, 85 S.Ct. 453]; Edwards v. South Carolina (1963) 372 U.S. 229, 237 [9 L.Ed.2d 697, 703, 83 S.Ct. 680]; Terminiello v. Chicago (1949) 337 U.S. 1 [93 L.Ed. 1131, 69 S.Ct. 894]; University Committee to End War in Vietnam v. Gunn, supra, 289 F. Supp. 469; Landry v. Daley (N.D. Ill. 1968) 280 F. Supp. 968; Thomas v. City of Danville (1967) 207 Va. 656 [152 S.E.2d 265].)
[11] In the past, provisions comparable to section 403 have been applied in other states to patently trivial violations of meeting rules and practices. (See, e.g., Stovall v. State (1935) 173 Miss. 755 [163 So. 504] (swearing at a single member of congregation outside church and not heard by others attending services); Nichols v. State (1897) 103 Ga. 61 [29 S.E. 431] (loud whispering heard by one other person at the meeting); compare Brown v. Louisiana (1966) 383 U.S. 131, 140-141 [15 L.Ed.2d 637, 644-645, 86 S.Ct. 719] (librarian unnerved and discomforted by presence of Negroes in all-white library); Model Pen. Code Tent. Draft No. 13 (1961) p. 38.) If they involve free speech, such peccadillos do not fall within the scope of section 403; they must instead be controlled only through the disciplinary power of the meeting.
[12] Meeting rules are rarely carefully spelled out or well known to the audience. In many cases these rules consist of aged and infrequently used by-laws or tacit understandings and habitual practices, or are otherwise cloaked in obscurity and uncertainty. Even if clear rules can be found, the officials of a meeting commonly suspend or simply ignore such rules to expedite the work of the meeting. (See, e.g., Literell v. Commonwealth (1936) 266 Ky. 235 [98 S.W.2d 909]; People v. Malone (1913) 156 App.Div. 10 [29 N.Y. Crim. 325, 141 N.Y.S. 149].) Silence of meeting officials in the face of unusual or raucous activity necessarily suggests that the rules of the meeting permit the activity or that the officials do not intend to enforce prohibitory rules to the contrary. (See Cox v. Louisiana (1965) 379 U.S. 536, 541 [13 L.Ed.2d 471, 476, 85 S.Ct. 453]; Cox v. Louisiana (1965) 379 U.S. 559, 569-571 [13 L.Ed.2d 487, 495-496, 85 S.Ct. 476]; Garner v. Louisiana (1961) 368 U.S. 157, 170, 171 [7 L.Ed.2d 207, 217, 218, 82 S.Ct. 248]; Thompson v. Louisville (1960) 362 U.S. 199, 205 [4 L.Ed.2d 654, 658, 80 S.Ct. 624, 80 A.L.R.2d 1355]; Gaddis v. State (1920) 105 Neb. 303 [180 N.W. 590].)

In addition, we note that criminal provisions similar to section 403 have generally been held inapplicable to one who breaches a meeting rule in the good faith belief that it is invalid. Courts have reasoned that the Legislature could not have intended that disputes about meeting or organizational rules or the power or authority of a chairman or other official be resolved by means of a criminal prosecution. (Woodall v. State (1908) 4 Ga. App. 783 [62 S.E. 485, 487]; State v. Jacobs (1889) 103 N.C. 397 [9 S.E. 404, 405]; Morris v. State (1888) 84 Ala. 457 [4 So. 628, 629-630]; compare Presbyterian Church v. Hull Church (1969) 393 U.S. 440 [21 L.Ed.2d 658, 89 S.Ct. 601]; State v. Linkhaw (1873) 69 N.C. 214 [12 Am.Rep. 645].)
[13] This general requirement for notification should not create any great obstacles to the efficient conduct of meetings, since such warnings are commonly given to those who speak out of turn or otherwise disturb or interrupt meetings. (See, e.g., State v. McNair (1965) 178 Neb. 763 [135 N.W.2d 463]; People v. Malone (1913) 156 App. Div. 10 [29 N.Y. Crim. 325, 141 N.Y.S. 149]; McAdoo v. State (Tex. Crim. App. 1896) 35 S.W. 966; Hull v. State (1889) 120 Ind. 153 [22 N.E. 117]; Wall v. Lee (1865) 34 N.Y. 141; McLain v. Matlock (1856) 7 Ind. 525 [65 Am.De. 746]
[14] Cf. Screws v. United States (1945) 325 U.S. 91, 104 [89 L.Ed. 1495, 1504, 65 S.Ct. 1031] (to avoid unconstitutional vagueness, "willful" element of federal statute proscribing the deprivation of constitutional rights under the color of law interpreted to require that defendant-official be shown to have had the "specific intent ... to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them").
[15] Compare University Committee to End War in Vietnam v. Gunn (W.D. Tex. 1968) 289 F. Supp. 469; Landry v. Daley (N.D. Ill. 1968) 280 F. Supp. 968; Marvin v. State (1862) 19 Ind. 181; with Jones v. State (1964) 219 Ga. 848 [136 S.E.2d 358].
[16] See fn. 1, supra, and New York Times Co. v. Sullivan, supra, 376 U.S. 254, 277 [11 L.Ed.2d 686, 704, 84 S.Ct. 710, 95 A.L.R.2d 1412].